HegUNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| STEVEON HEGWOOD, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 07 C 5840 |
| ) | |
| CANADIAN PACIFIC RAILWAY, ) | Judge Nan R. Nolan |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Steveon Hegwood has filed suit charging his former employer, Canadian Pacific Railway ("CPR"), with race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and CPR now seeks summary judgment on all of Mr. Hegwood's claims. For the reasons explained here, the motion is denied.

## BACKGROUND

CPR is a railroad company operating in the United States and Canada. Mr. Hegwood (African-American) worked at CPR's Bensenville, Illinois rail yard from 1978 until he was discharged on March 24, 2006. (Def. Facts ¶¶ 3-5.)[1] At the time of his discharge, Mr. Hegwood held the position of Freight Carman/Welder/Truck Driver, and he also had been working as a member of the derailment crew since 1998. (*Id.* ¶ 6.)

### A. The Collective Bargaining Agreement

CPR is a unionized employer with collective bargaining agreements governing the terms and conditions of employment for non-management employees. At all relevant times, Mr. Hegwood was a member of the Brotherhood of Railway Carmen Division of the Transportation Communications International Union ("TCIU"), and was subject to the collective bargaining agreement between TCIU

---

[1] Defendant's Statement of Material Facts is cited as "Def. Facts ¶ __."

and CPR (the "TCIU Agreement").  (*Id.* ¶¶ 7, 8.)  The TCIU Agreement governs, among other things, assignments, seniority and discipline, and it contains an exclusive grievance and arbitration procedure guaranteeing employees a full investigative hearing for any formal disciplinary action taken by CPR.  (*Id.* ¶¶ 9, 10.)  The grievance investigations allow employees to (1) testify on their own behalf; (2) have union representation; (3) call and cross-examine witnesses; (4) provide documentary evidence; and (5) appeal any disciplinary decision rendered to final resolution before a three-person arbitration panel with a Neutral Chair selected through the National Mediation Board.  (*Id.* ¶ 10.)

### B. CPR's Workplace Policies

In addition to the TCIU Agreement, CPR has written policies governing issues such as Equal Employment Opportunity/Anti-Discrimination/Affirmative Action; Workplace Harassment; and Violence in the Workplace.  CPR distributes these policies, which outline procedures for reporting discrimination and harassment, to all new employees, and mails them additional copies every year thereafter.  (*Id.* ¶¶ 11-13.)  The Violence in the Workplace policy defines a "violent act" as "one which causes or is likely to cause physical harm to persons."  A "threat" may include, but is not limited to "any act, gesture or statement that may reasonably be interpreted as potentially violent."  (Ex. 8 to Def. Mem., at 2.)  The policy provides that "[a]cts of violence are unacceptable, and where identified will lead to discipline up to and including termination and/or criminal charges." (Def. Facts ¶ 14.)

On January 2, 1996, CPR implemented a Positive Behavior & Performance Development ("PB&PD") Policy creating a two-phase procedure for addressing employee performance and behavior issues.  The first phase consists of informal and formal coaching and counseling between the supervisor and the employee.  In the second phase, formal discipline, CPR conducts a hearing (called a "formal investigation") to determine the facts and circumstances surrounding an employee's alleged violation of Company rules or procedures.  The hearing is conducted in

accordance with the terms of the employee's collective bargaining agreement and requires that a "conducting officer" listen to witness testimony; observe witness demeanor; make credibility determinations regarding witnesses; and consider any documentary evidence. At the conclusion of the formal investigation, the conducting officer prepares a written recommendation based on the hearing testimony and the employee's past discipline and performance history. The conducting officer is not, however, the final decisionmaker as to what discipline is imposed, if any. (*Id.* ¶¶ 15-18.)

### C. Mr. Hegwood's Performance

CPR claims that Mr. Hegwood's performance problems date back to March 1982 when he was terminated for fighting with another employee on company property. (*Id.* ¶ 20; Service Record, Ex. 10 to Def. Facts.) Mr. Hegwood first objects that Exhibit 10 constitutes inadmissible hearsay and should be stricken. The court disagrees. CPR has submitted an affidavit from Terri Revell, CPR's Employee Relations Advisor, who has confirmed that disciplinary records such as Mr. Hegwood's Service Record are (1) maintained in employee personnel files; (2) created at or near the time of the occurrence "by or from information transmitted by a person with knowledge of the events in question"; and (3) kept in the ordinary course of regularly conducted business activity. (Revell Aff., Ex. C to Response to Motion to Strike.) CPR's Exhibit 10, consisting of Mr. Hegwood's Service Record, thus qualifies as a business record and is admissible under FED. R. EVID. 803(6) and 902(11). *See Thanongsinh v. Board of Educ.*, 462 F.3d 762, 777 (7th Cir. 2006); *Arrington v. La Rabida Children's Hosp.*, No. 06 C 5129, 2008 WL 5388717, at *1 (N.D. Ill. Dec. 22, 2008). That said, the court does agree with Mr. Hegwood that the Service Record contains no indication as to the reason for his termination in 1982. This portion of the motion to strike is therefore granted.[2]

---

[2] The court also grants the motion to strike ¶ 19, which lacks any supporting citation. *See Smith v. Lamz*, 321 F.3d 680, 682 (7th Cir. 2003) (Local Rule 56.1 requires that facts include "citations to admissible evidence.")

In any event, a Public Law Board reinstated Mr. Hegwood on November 11, 1983 "with seniority rights unimpaired." (Def. Facts ¶ 20; Ex. 10 to Def. Facts, at SOO 00004.) Between 1993 and 2003, Mr. Hegwood received at least six warnings for issues such as excessive absences and substandard work performance. (*Id.* ¶ 21; Ex. 10 to Def. Facts.) Then on September 17, 2003, Mr. Hegwood became angry when his supervisor, James Selover (Caucasian), directed him to perform an assignment despite the existence of an allegedly "hazardous condition," which resulted in Mr. Hegwood sustaining a fall. (*Id.* ¶ 22; Pl. Fact Resp. ¶ 22; Pl. Facts ¶¶ 7, 8.)[3] Mr. Hegwood went to Mr. Selover's office to confront him about the incident, and stood in the doorway using an "elevated" voice. Mr. Hegwood admits that he "came on pretty strong" and that Mr. Selover felt threatened by his behavior. (*Id.* ¶ 22; Pl. Fact Resp. ¶ 22; Hegwood Dep., at 81-82.)

Mr. Selover reported the incident to his manager, Mike Urfer, stating that he thought Mr. Hegwood was going to hit him. Mr. Selover also reported that Dan Rossi, another CPR employee, had witnessed Mr. Hegwood's threatening behavior. (Pl. Facts ¶¶ 10, 11.) Mr. Urfer did not believe that Mr. Hegwood would actually hit Mr. Selover, but as a result of this incident, CPR initiated the formal discipline process under the PB&PD policy. Mr. Hegwood and Mr. Selover both testified at a hearing on October 29, 2003; Mr. Rossi was not called as a witness. (*Id.* ¶ 11; Ex. C to Pl. Facts.) On November 12, 2003, Mr. Hegwood received a 10-day suspension for "inapprop[riate] comments/threatening behavior" towards his supervisor. (Def. Facts ¶ 23; Ex. 10 to Def. Facts, at SOO 00008.) Mr. Hegwood appealed his suspension to a Public Law Board, which found that he was "abrupt, loud, swearing and aggressive" during the encounter, and that "there was . . . no excuse for [his] behavior." The Board reduced Mr. Hegwood's suspension to five days, but warned

---

[3] Plaintiff's Response to Defendant's Rule 56.1(a) Statement of Material Facts is cited as "Pl. Fact Resp. ¶ __." Plaintiff's Rule 56.1(b)(3)(C) Additional Statement of Material Facts is cited as "Pl. Facts ¶ __."

that "there are correct ways to handle such situations [and Mr. Hegwood] had better find these ways in the future if he values his employment." (*Id.* ¶ 24; Ex. 11 to Def. Facts, at 2-3.)

On November 1, 2004, Mr. Hegwood was disciplined for excessive absenteeism and failure to complete his assigned tour of duty on five separate occasions. (*Id.* ¶ 26.) Mr. Hegwood waived the formal investigation and received a five-day suspension. According to the PB&PD policy, an employee who waives his right to a hearing "must accept responsibility for the violation." (*Id.*; Ex. 9 to Def. Facts, at 9.)

In July 2005, Mr. Hegwood was disciplined again for unexcused tardies, absences and failure to protect his assignment in accordance with job requirements. Specifically, Mr. Selover informed Service Area Manager James P. Johnson that Mr. Hegwood had been absent and tardy on several dates in April and May 2005 without giving prior notice (Pl. Facts ¶ 12.) At a July 14, 2005 investigative hearing into the matter, however, Mr. Selover testified that, in fact, Mr. Hegwood did give him advance notice of all of the absences and tardies at issue with the exception of two, which occurred when Mr. Selover was not at work. (*Id.* ¶ 13; Def. Fact Resp. ¶ 13; Ex. E to Pl. Facts, at SOO 0385.)[4] Mr. Hegwood tendered a closing statement claiming that the investigation "could be [perceived] as harassment, biased discrimination in an effort to unfairly, adversely affect my employment." He further stated that if he could not achieve a satisfactory resolution, "I am putting all of you on notice that I plan to notify my attorney and EEOC to initial [sic] action to resolve this problem for me immediately." (Ex. E to Pl. Facts, at SOO 000400-01; Pl. Fact Resp. ¶ 40.) Mr. Johnson reviewed the hearing transcript when he received it in 2005, but took no action relating to Mr. Hegwood's complaint of discrimination. (Pl. Facts ¶¶ 37, 38; Def. Fact Resp. ¶¶ 37, 38; Johnson Dep., at 34.)

---

[4] Defendant's Response to Plaintiff's Statement of Additional Material Facts is cited as "Def. Fact Resp. ¶ __."

On August 1, 2005, Mr. Hegwood was suspended for 10 days in connection with the allegedly unexcused absences and tardies, though it appears this was subsequently changed to "no discipline." (Def. Facts ¶ 27; Pl. Fact Resp. ¶ 27; Johnson Dep., at 55.) Mr. Hegwood blamed Mr. Selover for the suspension, noting that Mr. Selover complained of absences he knew were justified, including a bereavement day following the funeral of Mr. Hegwood's mother, and a weekend when Mr. Hegwood was out of town visiting his wife. (Pl. Facts ¶¶ 16, 17.) In Mr. Hegwood's view, Mr. Selover was always "keep[ing] a close eye" on him. (Def. Facts ¶ 27.)

### D. Mr. Hegwood's Discharge

One of Mr. Hegwood's responsibilities at CPR was to complete and submit certain paperwork in a timely fashion to ensure proper train car movement in the rail yard. (*Id.* ¶ 28.) On January 12, 2006, Mr. Selover approached Mr. Hegwood in the break room following a routine safety meeting and asked him to submit some overdue paperwork. (*Id.*) Instead of responding to Mr. Selover, Mr. Hegwood said nothing and intentionally ignored him. Mr. Selover became angry, at which point Mr. Hegwood started walking out of the break room and into the locker room. (*Id.* ¶ 29; Hegwood Dep., at 59-61.) Mr. Hegwood claims that he only walked away after Mr. Selover spoke to him in a "very degrading manner" and tried to provoke an incident. (Pl. Fact Resp. ¶ 29.) Mr. Hegwood also contends that Mr. Selover stepped in his path and got up into his face, at which point he threw up his hands to avoid any contact with Mr. Selover. (*Id.*; Pl. Facts ¶ 29; Hegwood Dep., at 61, 65.)

At a formal investigation/hearing on March 2, 2006, Mr. Selover testified that when he asked Mr. Hegwood for the paperwork, Mr. Hegwood stated in a raised voice, "if you want the paperwork you come and get it." (Def. Facts ¶ 30; Ex. 12 to Def. Facts, at 16.) Mr. Selover claimed that in response, he said that it was Mr. Hegwood's responsibility to bring the paperwork to the office, prompting Mr. Hegwood to stand up and say, "you don't fucking tell me what to do." According to Mr. Selover, Mr. Hegwood called him a "fucking fat boy" and "was gritting his teeth, his fists were

6

clenched and he told me to . . . get out of his way because he is going to bite my fucking head off." (*Id.*; Pl. Facts ¶ 21.)

Mr. Hegwood denies this account, noting that none of the four individuals present during the encounter saw him threaten Mr. Selover. Earnest Jones, Jerry Landerholm, William Raia and Carlos Guzman all testified that they did not hear Mr. Hegwood use any profanity. Mr. Landerholm further stated that there was nothing unusual in Mr. Hegwood's tone of voice. (Pl. Facts ¶¶ 22-25.) Mr. Hegwood testified that Mr. Selover was "pushing his buttons" and that he was trying to keep "the old Steve" down and "not be aggressive and not lash out at" Mr. Selover. (Def. Facts ¶ 31.) Notably, Mr. Jones and Mr. Guzman both stated that Mr. Selover specifically moved into Mr. Hegwood's path, got into his face, tried to block him from leaving the break room, and then followed him into the locker room. (Pl. Facts ¶ 27.)

Mr. Hegwood also stresses that CPR's private police officer, James Tubbs, who arrived on the scene shortly after the encounter and obtained statements from the relevant parties, testified at the hearing that when he questioned Mr. Selover at the scene, Mr. Selover said that Mr. Hegwood "told him he didn't have [the paperwork] but he would get it to him, if he wanted it he could come and get it himself." (Ex. 12 to Def. Facts, at SOO 00280; Def. Fact Resp. ¶ 28.) Officer Tubbs agreed that Mr. Hegwood was trying to get away from the encounter with Mr. Selover, and he confirmed that Mr. Jones and Mr. Landerholm were consistent in their written and oral statements to him. (*Id.* at SOO 00285; Def. Fact Resp. ¶ 30; Pl. Facts ¶ 31.)

Despite these inconsistencies, the parties do agree that Mr. Selover never tried to touch Mr. Hegwood, and that Mr. Hegwood called him a "fat boy." (Hegwood Dep., at 51-52, 66.) In addition, it is undisputed that although Mr. Hegwood claims that he had already submitted the paperwork to the second shift supervisor the previous night, he never said as much to Mr. Selover. (Pl. Facts ¶¶ 19, 20; Pl. Fact Resp. ¶ 28; Hegwood Dep., at 59-60.) At the conclusion of the March 2006 hearing, conducting officer Robert Ryde determined that Mr. Hegwood had violated CPR's Violence

7

in the Workplace policy and recommended that he be discharged. (Def. Facts ¶ 35; Ex. 13 to Def. Facts.)

On March 24, 2006, Service Area Manager Johnson sent Mr. Hegwood a formal notification terminating his employment. Mr. Johnson stated:

> As a result of the facts developed at the investigation, I find that the hearing did establish that your behavior was inappropriate toward your Supervisor James Selover, which included making threatening comments to him. As a result, you are hereby dismissed from service effective immediately for violation of Canadian Pacific Railway's Company policy on Violence in the Workplace.

(Def. Facts ¶ 36; Ex. 14 to Def. Facts.) Mr. Hegwood finds it significant that Mr. Johnson and Mr. Urfer both allowed him to continue working under Mr. Selover's supervision between January 12 and March 24, 2006 despite his allegedly threatening conduct towards Mr. Selover. (Pl. Fact Resp. ¶ 30; Pl. Facts. ¶¶ 33, 34.) CPR explains that, under the collective bargaining agreement, Mr. Hegwood had the right to continue working pending an investigation into the incident. (Def. Fact Resp. ¶¶ 33, 34; TCIU Agreement, Ex. 5 to Def. Facts, at 15.)

Mr. Hegwood appealed his termination through the union grievance process. On October 3, 2008, a Public Law Board denied the appeal, finding "ample evidence of record to persuade [the Board] that Claimant was guilty as charged." (Def. Facts ¶ 37; Ex. 15 to Def. Facts, at 3.) In reaching this conclusion, the Board found it "likely" that Mr. Selover "kept instigating" the encounter and that Mr. Hegwood was trying to get away. (Ex. 15 to Def. Facts, at 4; Pl. Fact Resp. ¶ 37.) Nevertheless, the testimony confirmed that Mr. Selover gave Mr. Hegwood an instruction, and "[r]emoving issues of threat or swearing, the record confirms a denial of the request." (*Id.*) The Board upheld Mr. Hegwood's discharge, finding "sufficient proof that the Claimant in some manner refused to properly respond to a Supervisor," and that Mr. Hegwood admitted calling Mr. Selover a "fat boy." (*Id.*)

### E. Mr. Hegwood's Charge of Discrimination and Complaint

On April 26, 2006, Mr. Hegwood filed a charge of discrimination with the EEOC alleging race discrimination and retaliation. (Def. Facts ¶ 38.) In that charge, Mr. Hegwood alleged, among other things, that between 1998 and 2006, CPR employees Bruce Axelson and Jerry Meyers (both white) referred to him and other black employees as "squirrel" and "buckwheat" on six or seven occasions. He also claimed that white employees who berated their supervisors were not assessed similar discipline. (*Id.* ¶ 39.) With respect to the retaliation claim, Mr. Hegwood alleged that he complained to Mr. Johnson about the name-calling by Mr. Meyers[5] in March 2001, and admits that after Mr. Johnson looked into it, Mr. Meyers stopped the behavior. (*Id.* ¶¶ 40, 41; Hegwood Dep., at 19, 21.) Mr. Hegwood also stated that he complained to Mr. Johnson about alleged discrimination in late 2005 or early 2006, and again following the January 12, 2006 altercation that led to his discharge. (*Id.* ¶ 40; Hegwood Dep., at 47.)

Mr. Hegwood filed this federal lawsuit on October 16, 2007, alleging similar claims of race discrimination and retaliation.

## **DISCUSSION**

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In determining whether there is a genuine issue of fact, the court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008). The nonmoving party, however, "must do more than raise some metaphysical doubt as to the material facts; [he] must come forward with specific facts showing that there is a genuine issue for trial." *Argyropoulos*, 539 F.3d at 732 (quoting *Keri v. Board of Trustees of Purdue Univ.*,

---

[5] Mr. Hegwood testified that he did not complain about Mr. Axelson because he worked with him and "wanted to try to keep peace." (Hegwood Dep., at 21.)

458 F.3d 620, 628 (7th Cir. 2006)).  Courts find a genuine issue for trial "only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party."  *Id.* (quoting *Sides v. City of Champaign*, 496 F.3d 820, 826 (7th Cir. 2007)).

Mr. Hegwood claims that CPR discriminated against him on the basis of his race when it terminated his employment on March 24, 2006.  He also claims that CPR discharged him in retaliation for complaints he made about unlawful discrimination.  The court addresses each argument in turn.

**A.    Race Discrimination**

Mr. Hegwood first argues that CPR discharged him because of his race.  Mr. Hegwood may establish discrimination under Title VII using either the direct or indirect method of proof.  Under the direct method, Mr. Hegwood must "introduce evidence showing that the decision to terminate him was motivated by animus based upon his race."  *Henry v. Jones*, 507 F.3d 558, 566 (7th Cir. 2007).  This does not require a "near-admission" of improper motivation, but includes "circumstantial evidence which suggests discrimination albeit through a longer chain of inferences."  *Id.* (quoting *Luks v. Baxter Healthcare Corp.*, 467 F.3d 1049, 1052 (7th Cir. 2006)).

In this case, Mr. Hegwood has chosen to proceed under the familiar *McDonnell Douglas* burden-shifting analysis.  He must first establish a prima facie case of discrimination by proving that (1) he is a member of a protected class; (2) he was performing at a level that met CPR's legitimate job requirements; (3) he was subject to an adverse employment action; and (4) he was treated differently than similarly situated employees outside the protected class. *Tyson v. Gannett Co.*, 538 F.3d 781, 783 (7th Cir. 2008).  If Mr. Hegwood succeeds in making out a prima facie case, the burden shifts to CPR to articulate a legitimate, nondiscriminatory explanation for the adverse employment action.  If such a reason is offered, Mr. Hegwood "must present evidence that would allow the trier of fact to conclude that [CPR's] proffered reason is pretextual."  *Goodwin v. Board of Trustees of Univ. of Ill.*, 442 F.3d 611, 617-18 (7th Cir. 2006).

CPR does not dispute that Mr. Hegwood is within the protected class or that his discharge constitutes an adverse employment action. CPR insists, however, that (1) Mr. Hegwood was not meeting the Company's legitimate business expectations; (2) no similarly-situated employees outside the protected class received more favorable treatment; and, in any event, (3) Mr. Hegwood cannot demonstrate that CPR's legitimate, nondiscriminatory explanation for discharging him is a pretext for discrimination.

### 1. Legitimate Job Expectations

CPR argues that Mr. Hegwood was not meeting its legitimate expectations, as evidenced by the counseling he received for threatening behavior, absenteeism and failure to follow instructions between 2003 and 2005, and his violation of CPR's Violence in the Workplace policy in January 2006. (Def. Mem., at 5.)[6] Mr. Hegwood denies the validity of these disciplinary actions and insists that "there is enough evidence to raise a genuine issue of fact that Plaintiff met the legitimate expectations of his job." (Pl. Resp., at 8.)[7]

In this case, "the second element of the prima facie case, satisfactory job performance, and the issue of pretext focus on the same circumstances because [CPR] maintains that the discharge was based on its reasonable belief that [Mr. Hegwood] was not performing in an acceptable manner." *Mihal v. St. Vincent Carmel Hosp., Inc.*, No.1:06-cv-482-SEB-JPG, 2007 WL 4256607, at *8 (S.D. Ind. Nov. 30, 2007) (quoting *Denisi v. Dominick's Finer Foods, Inc.*, 99 F.3d 860, 864 (7th Cir. 1996)). "[B]ecause the issue of satisfactory job performance, which lies at the heart of this dispute, must be analyzed in detail at both stages of the *McDonnell Douglas* test, it is therefore simpler to run through that analysis only once." *Hague v. Thompson Distribution Co.*, 436 F.3d 816,

---

[6] Defendant's Memorandum of Law in Support of Motion for Summary Judgment is cited as "Def. Mem., at __."

[7] Plaintiff's Response to Defendant's Motion for Summary Judgment is cited as "Pl. Resp., at __."

11

823 (7th Cir. 2006) (quoting *Rummery v. Illinois Bell Tel. Co.*, 250 F.3d 553, 556 (7th Cir. 2001)). Thus, the court will proceed with an analysis of Mr. Hegwood's showing of pretext, "while keeping in mind that if [Mr. Hegwood] did not present sufficient evidence of a pretext, [he] also did not show that [he was] meeting [CPR's] expectations." *Id.*

### 2. Similarly-Situated Employees

Before turning to pretext, the court first addresses CPR's additional argument that Mr. Hegwood's prima facie case fails because he cannot identify any similarly-situated employees outside the protected class who were treated more favorably. To be similarly situated, an employee "need not be 'identical,' but the plaintiff must show that the other employee 'dealt with the same supervisor, [was] subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish [his] conduct or the employer's treatment of [him].'" *Amrhein v. Health Care Serv. Corp.*, 546 F.3d 854, 860 (7th Cir. 2008) (quoting *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008)). *See also Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 791 (7th Cir. 2007).

Mr. Hegwood first claims that when a derailment occurred, CPR often did not inform him but, instead, called Dave Skrzypic, a white employee with less seniority, to work the scene and earn the overtime pay. (Pl. Facts ¶ 2.) Mr. Hegwood also claims that on numerous occasions, Mr. Skrzypic called Mr. Selover a "fat ass" and stated that "I am not doing . . . shit" when given an assignment. Mr. Selover, however, never took any disciplinary action against Mr. Skrzypic. (*Id.* ¶ 3.) Another white employee, Ricky Baker, allegedly shoved a car down the track in a derailment, and "went off," "sweared" and "cussed" at Mr. Selover, but received no discipline. (*Id.* ¶ 4.) Mr. Baker and a third employee, "Pete," also allegedly were allowed to keep their cars in a certain parking location on one occasion in 2003, while Mr. Selover directed Mr. Hegwood to move his car from the same location. (*Id.* ¶ 6.)

CPR claims that Mr. Hegwood failed to show that these individuals engaged in similar conduct, and had similar discipline histories and circumstances. (Def. Reply, at 4.)[8] CPR correctly notes that Mr. Hegwood bears the burden of proving this element of his prima facie case, and that he has not provided any evidence regarding these employees' job descriptions, work performance or disciplinary histories. *See Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 546 (7th Cir. 2002) ("The burden is on [the plaintiff] to establish the similarity between himself and the proposed comparable employees.") Nor has he indicated exactly when most of these alleged events occurred.

Nevertheless, Mr. Skrzypic and Mr. Baker arguably engaged in similar conduct by swearing at Mr. Selover and refusing to follow an order, yet they received different discipline than Mr. Hegwood. CPR denies the truth of these allegations, but offers nothing to refute them. CPR also makes a general assertion, without any supporting evidence, that Mr. Hegwood is not similarly situated to these men in any relevant respect. (*See, e.g.*, Def. Fact Resp. ¶¶ 3, 4; Def. Reply, at 4.) This is insufficient for purposes of summary judgment. *See Vardon Golf Co. v. Karsten Mfg. Corp.*, No. 99 C 2785, 2000 WL 1304999, at *6 (N.D. Ill. Sept. 13, 2000) (a "bald assertion . . . is not proper or sufficient support for a motion for summary judgment.") CPR does insist that neither Mr. Skrzypic nor Mr. Baker threatened his supervisor. (Def. Mem., at 7.) As discussed below, however, there is a question of fact as to whether Mr. Hegwood did, either. Drawing all reasonable inferences in Mr. Hegwood's favor, the court concludes that a jury could find that Mr. Skrzypic and Mr. Baker are similarly situated to Mr. Hegwood.[9]

---

[8] Defendant's Reply Memorandum in Support of Summary Judgment is cited as "Def. Reply, at __."

[9] To the extent Mr. Hegwood cannot identify "Pete's" last name and has provided no evidence regarding his interactions with Mr. Selover, Pete is not a viable comparable in this case. *See Cooper v. Potter*, No. 02 C 7341, 2004 WL 524446, at *4 (N.D. Ill. Feb. 24, 2004) (declining to address two employees who were allegedly similarly situated to the plaintiff where the plaintiff "identifies these employees by first name only and fails to offer any specifics of their job

### 3. Pretext

CPR argues that summary judgment is nonetheless appropriate because Mr. Hegwood cannot demonstrate that the Company's proffered reasons for terminating his employment – his violation of the Violence in the Workplace policy and his reaching the termination stage of the PB&PD policy – were a pretext for unlawful discrimination. "Pretext" means "a dishonest explanation, a lie rather than an oddity or an error." *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 642 (7th Cir. 2008) (quoting *Hague*, 436 F.3d at 823). "Showing pretext requires proof that the defendant's explanation is unworthy of credence." *Id.* (quoting *Filar v. Board of Educ. of City of Chicago*, 526 F.3d 1054, 1063 (7th Cir. 2008)). "Evidence that an employer made a mistake or that the decision was ill-advised cannot meet this burden." *Ellis v. United Parcel Serv., Inc.*, 523 F.3d 823, 828 (7th Cir. 2008).

Mr. Hegwood concedes that he was suspended in 2003 for confronting Mr. Selover about an allegedly hazardous assignment, and again in 2004 for excessive absenteeism. He denies that he threatened Mr. Selover in 2003, and stresses that Operations Manager Michael Urfer did not believe he would actually hit his supervisor. A Public Law Board found, however, that even assuming Mr. Hegwood was correct about the safety matter, he was "abrupt, loud, swearing and aggressive" during the encounter, and "there was . . . no excuse for [his] behavior." (Def. Facts ¶ 24; Ex. 11 to Def. Facts, at 2-3.)

More questionable is Mr. Hegwood's discipline in July 2005 for unexcused tardies, absences and failure to protect his assignment in accordance with job requirements. Mr. Selover told Mr. Johnson that Mr. Hegwood had been absent and tardy on several dates in April and May 2005 without giving prior notice. At the July 14, 2005 investigative hearing, however, Mr. Selover

---

performance."). *See also Lucas v. Chicago Transit Authority*, 367 F.3d 714, 730 n.16 (7th Cir. 2004) ("[C]onclusory statements do not satisfy [the plaintiff's] burden to put forth a similarly situated employee who is directly comparable in all respects and was treated more favorably.")

14

admitted that Mr. Hegwood actually did give him advance notice of all of the absences and tardies at issue with the exception of two, which occurred when Mr. Selover was not at work. Nevertheless, on August 1, 2005, Mr. Hegwood was suspended for 10 days. CPR apparently changed the suspension to "no discipline," but this is not reflected in Mr. Hegwood's Service Record. Moreover, it appears that conducting officer Robert Ryde did not know about this change when he recommended that Mr. Hegwood be discharged in March 2006. (Johnson Dep., at 55.)

With respect to the 2006 policy violation regarding Mr. Selover's request for paperwork, Mr. Hegwood admits that he called Mr. Selover a "fat boy," that he initially ignored Mr. Selover, and that he never told Mr. Selover that he had already turned in the paperwork to the second shift supervisor. Mr. Hegwood's speculation that Mr. Selover nonetheless knew this fact is insufficient for purposes of summary judgment. *See Jones v. IKEA Illinois, LLC*, No. 07 C 3725, 2008 WL 5169749, at *3 (N.D. Ill. Dec. 4, 2008) (citing *Rand v. CF Indus., Inc.*, 42 F.3d 1139, 1146 (7th Cir. 1994)) ("'Inferences and opinions must be grounded on more than flights of fancy, speculations, hunches, intuitions, or rumors,' as discrimination law would be unmanageable if disgruntled employees could defeat summary judgment on mere speculations about the defendant's motives.")

At the same time, Officer Tubbs testified that when he questioned Mr. Selover at the scene of the incident, Mr. Selover said that Mr. Hegwood "told him he didn't have [the paperwork] *but he would get it to him* . . ." (Ex. 12 to Def. Facts, at SOO 00280) (emphasis added). Moreover, it appears that Mr. Selover – who appears to have wrongly accused Mr. Hegwood of unexcused tardies and absences in 2005 – instigated the confrontation and tried to provoke Mr. Hegwood when requesting the paperwork, only to turn around and accuse Mr. Hegwood of threatening him. (Pl. Resp., at 7.) Indeed, the October 3, 2008 Public Law Board found it "likely" that Mr. Selover "kept instigating" the encounter and that Mr. Hegwood was trying to get away. The Board did uphold the discharge, but not on the basis that Mr. Hegwood threatened his supervisor. Rather, the Board stated, "[r]emoving issues of threat or swearing," there was "sufficient proof that the

15

Claimant in some manner refused to properly respond to a Supervisor" and called Mr. Selover a "fat boy."

Viewing the facts in a light most favorable to Mr. Hegwood, there is a question of fact as to the truth of CPR's decision to discharge him for threatening Mr. Selover. There is also a question of fact as to whether this constituted Mr. Hegwood's "third violation in a 24-month period, which justifie[d] termination under CPR's progressive discipline policy." (Def. Reply, at 5.) As noted, the July 2005 discipline was largely unsupported and ultimately withdrawn.

CPR stresses that Mr. Johnson, and not Mr. Selover, made the decision to discharge Mr. Hegwood, and suggests that there is no basis to question Mr. Johnson's motive or intent in that regard. (Def. Reply, at 5.) Mr. Hegwood counters that Mr. Selover influenced the termination decision and injected discriminatory animus. (Pl. Resp., at 10 (citing *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1459 (7th Cir. 1994)) ("Summary judgment generally is improper where the plaintiff can show that an employee with discriminatory animus provided factual information or other input that may have affected the adverse employment decision.").) To the extent that (1) the 2003, 2005 and 2006 disciplinary proceedings occurred solely based on Mr. Selover's accusations; (2) Mr. Johnson reviewed the 2005 hearing transcript and knew that Mr. Selover had made inaccurate statements about Mr. Hegwood in the past; (3) Mr. Johnson knew that none of the witnesses to the 2006 encounter supported Mr. Selover's version of events; and (4) Mr. Johnson knew that conducting officer Ryde was not aware in March 2006 that the 2005 suspension had been withdrawn, a jury could reasonably conclude that Mr. Johnson did not honestly believe that Mr. Hegwood had threatened Mr. Selover or that he had reached the termination stage under CPR's PB&PD policy. *See, e.g., Kodl v. Board of Educ. School Dist. 45, Villa Park*, 490 F.3d 558, 562 (7th Cir. 2007) ("The only concern in reviewing an employer's reasons for termination is the honesty of the employer's belief."); *Pleniceanu v. Brown Printing Co.*, No. 05 C 5675, 2007 WL 781726, at *8

(N.D. Ill. Mar. 12, 2007) ("[A]n employer may be liable for a discrimination where it acts as a conduit for another employee's bias.")

For these reasons, summary judgment is not appropriate on Mr. Hegwood's race discrimination claim. *See Rudin v. Lincoln Land Community College*, 420 F.3d 712, 726 (7th Cir. 2005) (quoting *Courtney v. Biosound, Inc.*, 42 F.3d 414, 423 (7th Cir. 1994)) ("[I]f there is a question of fact as to the believability of an employer's purported reasons for an employment decision, then, 'even if the evidence presented by [the plaintiff] does not compel the conclusion that [her employer] discriminated against [her] when making its . . . decision, at a bare minimum it suffices to defeat [the employer's] summary judgment motion.'"); *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 417 (7th Cir. 2006) (if employer's stated reason for a decision is "not the true ground, the employer may still be innocent of discrimination . . . . But the case could not be resolved on summary judgment, because a trier of fact (judge or jury) would be entitled to infer a discriminatory motive from the pretextual character of the employer's ground.")

**B.    Retaliation**

Mr. Hegwood also argues that CPR terminated his employment in retaliation for complaints he made about discrimination. As with his discrimination claim, Mr. Hegwood may establish a prima facie case of retaliation using the direct or indirect method of proof. *Benders v. Bellows and Bellows*, 515 F.3d 757, 764 (7th Cir. 2008). Mr. Hegwood makes a cursory argument that he has direct evidence of retaliation, which requires a showing of (1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two. *Amrhein*, 546 F.3d at 858. "Undeveloped arguments," however, "need not be considered by the court." *Stocker v. Kalahari Dev., LLC*, No. 06-C-366-C, 2007 WL 1140246, at *6 (W.D. Wis. Apr. 16, 2007) (citing *Central States, Southeast and Southwest Areas Pension Fund v. Midwest Motor Exp., Inc.*, 181 F.3d 799, 807 (7th Cir. 1999)) ("Arguments not developed in any meaningful way are waived.")

The court thus proceeds to Mr. Hegwood's indirect evidence of retaliation, which requires him to show that he (1) engaged in statutorily protected activity; (2) met CPR's legitimate expectations; (3) suffered an adverse employment action; and (4) was treated less favorably than similarly situated employees who did not engage in statutorily protected activity." *Amrhein*, 546 F.3d at 859. The burden then shifts to CPR to produce a nondiscriminatory explanation for its action. If it does so, then the burden shifts back to Mr. Hegwood, who must demonstrate that CPR's proffered reason is pretextual. *Id.* at 859-60.

CPR claims that Mr. Hegwood cannot establish his prima facie case or demonstrate that its stated reasons for his discharge are a pretext for retaliation. The parties' analysis of these issues is largely the same as discussed above in connection with Mr. Hegwood's race discrimination claim. Thus, summary judgment is appropriate on the retaliation claim only if Mr. Hegwood did not engage in protected activity.

### 1. Protected Activity

Mr. Hegwood claims that he complained to Mr. Johnson of discrimination on three separate occasions: (1) in March 2001; (2) in late 2005/early 2006; and (3) after the January 12, 2006 incident with Mr. Selover. The March 2001 complaint concerned the white employee who referred to Mr. Hegwood and other black employees as "buckwheat" or "squirrel" on six or seven occasions starting in 1998. (Pl. Facts ¶ 1; Def. Fact Resp. ¶ 1.) When Mr. Hegwood complained, Mr. Johnson looked into it and the employee stopped the behavior. (Def. Facts ¶¶ 40, 41; Hegwood Dep., at 19, 21.) Regardless, this arguably was protected activity. *See Daniels v. Essex Group, Inc.*, 937 F.2d 1264, 1274 (7th Cir. 1991) (recognizing the nickname "Buckwheat" as a "racial taunt."); *Sanders v. Mid City Salon Resources, LLC*, No. 06 C 3971, 2008 WL 244292, at *11 (N.D. Ill. Jan. 23, 2008) (indicating that "complaining to upper management that [a co-worker] had made a racial slur" was protected activity).

The late 2005/early 2006 complaint consists of Mr. Johnson's review of the July 2005 hearing transcript, in which Mr. Hegwood stated that the investigation "could be [perceived] as harassment, biased discrimination in an effort to unfairly, adversely affect my employment," and warned that if he could not achieve a satisfactory resolution, he was "putting all of you on notice that I plan to notify my attorney and EEOC to initial [sic] action to resolve this problem for me immediately." (Ex. E to Pl. Facts, at SOO 000400-01; Pl. Fact Resp. ¶ 40.) CPR claims that this is not protected activity because Mr. Hegwood "did not complain that the harassment resulted from his membership in a protected class." (Def. Mem., at 11.)

"To constitute protected expression, '[a] complaint must indicate the discrimination occurred because of sex, race, national origin, or some other protected class. Merely complaining in general terms of [discrimination or] harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient.'" *Kodl*, 490 F.3d at 563 (quoting *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006)). When Mr. Hegwood complained about "harassment" and "biased discrimination," he did not claim that it resulted from his race. Nevertheless, Mr. Hegwood did threaten to file a complaint with the EEOC, which would certainly be a protected activity under Title VII. *See, e.g., Chism v. Kenall Mfg. Co.*, No. 06 C 3374, 2008 WL 506115, at *13 (N.D. Ill. Feb. 15, 2008). Thus, Mr. Hegwood's July 2005 complaint satisfies the first prong of his prima facie case.[10]

### 2. Pretext

CPR again cites Mr. Hegwood's violation of the Violence in the Workplace policy and reaching the termination stage of the PB&PD policy as legitimate, nondiscriminatory reasons for his discharge. (Def. Reply, at 6.) Having determined that a reasonable jury could find these

---

[10] The parties have not provided any details regarding Mr. Hegwood's third alleged complaint of discrimination in March 2006, and the court need not address it here.

explanations pretextual, CPR's motion for summary judgment on the retaliation claim must be denied.

## **CONCLUSION**

For the reasons stated above, Canadian Pacific Railway's motion for summary judgment [Doc. 42] is denied. Hegwood's motion to strike [Doc. 50] is granted in part and denied in part, as stated in this opinion.

ENTER:

Dated: April 3, 2009

_____
NAN R. NOLAN
United States Magistrate Judge